Terry HEDGEPETH, Appellant,

v.

WHITMAN WALKER CLINIC
and Mary Fanning, M.D.,
Appellees.

No. 07–CV–158.

District of Columbia Court of Appeals.

Argued En Banc June 10, 2010.
Decided June 30, 2011.

Jonathan C. Dailey, with whom Robert C. Kostecka and David P. Korteling, Bethesda, MD, were on the brief, for appellant.

Marc Fiedler, with whom Laurie A. Amell, Washington, DC, was on the brief, for the Trial Lawyers Association of Metropolitan Washington, D.C., as amicus curiae in support of appellant.

Alfred F. Belcuore, Washington, DC, for appellees.

Kenneth H. Rosenau filed a brief on behalf of the Children's National Medical Center as amicus curiae in support of appellees.

Before WASHINGTON, Chief Judge, RUIZ, GLICKMAN, FISHER, BLACKBURNE–RIGSBY, THOMPSON, and OBERLY, Associate Judges, REID * and KRAMER,** Associate Judges, Retired, and FARRELL, Senior Judge.

RUIZ, Associate Judge:

Appellant Terry Hedgepeth alleges that he suffered serious emotional distress after the doctor he saw at the Whitman Walker Clinic negligently informed him that he was HIV positive when, in fact, he was not. Appellant presented evidence that, as a result of the mistaken diagnosis, he was severely clinically depressed and suffered repercussions in his employment and personal life until another clinic correctly informed him that he was not afflicted with HIV, five years later. The Superior Court granted appellees' motion for summary judgment on the grounds that appellant had failed to establish the requisite facts for the tort of negligent infliction of emotional distress, where there is no other harm. A division of this court affirmed, agreeing with the Superior Court that appellees' alleged negligence did not place appellant within a "zone of physical danger," as required for recovery of emotional distress damages by *Williams v. Baker*, 572 A.2d 1062 (D.C.1990) (en banc). *Hedgepeth v. Whitman Walker Clinic*, 980 A.2d 1229 (D.C.2009).

We granted the petition for rehearing *en banc* to decide whether the "zone of physical danger test" should be applied to preclude appellant's claim that his doctor's negligent misdiagnosis caused him serious emotional injury. *Hedgepeth v. Whitman Walker Clinic*, 990 A.2d 455 (D.C.2010). After reviewing the development of the law on this issue and the reason for the *Williams* zone of physical danger test, we conclude that appellant's claim should not be barred simply because he was not put at risk of physical injury. Although the rule in *Williams* continues to be generally applicable to claims of negligent infliction of emotional distress, the zone of physical danger requirement imposes an unnecessary limitation upon, and is not to be applied indiscriminately in all cases to, claims of emotional distress brought against a defendant who has a relationship with the plaintiff, or has undertaken an obligation to the plaintiff, and whose negligence causes serious emotional distress to the plaintiff. We, therefore, adopt a rule— itself a limited one—that supplements the zone of physical danger test. We hold that a duty to avoid negligent infliction of serious emotional distress will be recognized only where the defendant has an obligation to care for the plaintiff's emotional well-being or the plaintiff's emotional well-being is necessarily implicated by the nature of the defendant's undertaking to or relationship with the plaintiff, and serious emotional distress is especially likely to be caused by the defendant's negligence. We conclude this is such a case: the appellees, in the context of a doctor-patient relationship, undertook to test and treat appellant for HIV, an undertaking that would necessarily implicate the patient's emotional well-being and entailed a specially likely risk of serious emotional distress. Appellant has presented evidence supporting his allegations that appellees negligently misdiagnosed him as being HIV positive and that this misdiagnosis caused him to suffer serious emotional distress. We, therefore, reverse the grant of summary judgment for appellees and remand the case for further proceedings consistent with the principles we set out in this opinion.

---

* Judge Reid was an Associate Judge of the court at the time of argument. Her status changed to Associate Judge, Retired, on April 7, 2011.

** Judge Kramer was an Associate Judge of the court at the time of argument. Her status changed to Associate Judge, Retired, on May 1, 2011.

## I. General Principles of Negligence

■ It is well-established that a claim alleging the tort of negligence must show: (1) that the defendant owed a duty to the plaintiff, (2) breach of that duty, and (3) injury to the plaintiff that was proximately caused by the breach. *See, e.g., District of Columbia v. Cooper*, 483 A.2d 317, 321 (D.C.1984) (citing Prosser, Handbook of the Law of Torts § 30 (4th ed.1971) (hereinafter "Handbook of the Law of Torts")). The court's threshold determination—namely, the existence of a duty—is "essentially a question of whether the policy of the law will extend the responsibility for the conduct to the consequences which have in fact occurred." *Id.* at 321 (quoting Handbook of the Law of Torts, *supra*, § 42). Stated another way: "The statement that there is or is not a duty begs the essential question—whether the plaintiff's interests are entitled to legal protection against the defendant's conduct." *Id.* (quoting Handbook of the Law of Torts, *supra*, § 53). In this case, we are tasked with determining the scope of the duty to avoid causing emotional distress that results from negligence.

### A. Duty and Foreseeability

■ In general, courts rely on the concept of "foreseeability" to determine whether the defendant owed a duty to the claimant in a negligence action and examine whether the risk to the claimant was "reasonably foreseeable" to the defendant.[1] *See, e.g., District of Columbia v. Shannon*, 696 A.2d 1359, 1366 (D.C.1997); *Haynesworth v. D.H. Stevens Co.*, 645 A.2d 1095, 1098 (D.C.1994). If the injury that befell the plaintiff was "reasonably foreseeable" to the defendant, then courts will usually conclude that the defendant owed the plaintiff a duty to avoid causing that injury; if the injury was not "reasonably foreseeable," then there was no duty. *Compare Shannon*, 696 A.2d at 1366 (holding that because playground accident due to poor maintenance could have been reasonably foreseeable to the District, trial court properly denied District's motion for judgment on the ground it owed no duty to child using playground), *with Galloway v. Safeway Stores, Inc.*, 632 A.2d 736, 739–40 (D.C.1993) (holding that grocery store did not have "duty to foresee and protect" customer from rowdy children).[2] *See also Bd. of Trs. of the Univ. of the District of Columbia v. DiSalvo*, 974 A.2d 868, 870–71 (D.C.2009) (discussing the required showing of "heightened foreseeability" where the plaintiff claims that the defendant should be held liable for intervening criminal acts).

1. We note that the concept of foreseeability is related to a court's determination of proximate, or legal, cause as well as to its determination of duty. "Strictly, the problem [of foreseeability] is one of determining whether the duty imposed on the actor was designed to protect the one harmed from the risk of harm from the hazard in question. However, courts frequently treat such problems as problems of causation." Restatement (Second) of Torts § 435 cmt. c (1977); *see also* Dan B. Dobbs, Robert E. Keeton, & David G. Owen, Prosser and Keeton on Torts § 42, at 274 (5th ed.1984) (hereinafter "Prosser and Keeton on Torts") ("It is quite possible to state every question which arises in connection with 'proximate cause' in the form of a single question: was the defendant under a duty to protect the plaintiff against the event which did in fact occur?").

2. Prosser and Keeton provide the following example: "[W]henever the automobile driver should, as a reasonable person, foresee that his conduct will involve an unreasonable risk of harm to other drivers or to pedestrians, he is then under a duty to them to exercise the care of a reasonable person as to what he does or does not do." Prosser and Keeton on Torts, *supra*, § 53, at 358.

## B. Duty and the Relationship Between the Parties

 The relationship between the plaintiff and the defendant is closely related to a court's determination of the foreseeability of the plaintiff's injury and, ultimately, the scope of the defendant's duty. *See, e.g., Washington Metro. Area Transit Auth. v. O'Neill,* 633 A.2d 834, 840 (D.C. 1993) ("[W]here a special relationship exists, such as between a common carrier and its passengers, the carrier undeniably has a duty to protect its passengers from foreseeable harm arising from criminal conduct of others."); *Graham v. M & J Corp.,* 424 A.2d 103, 105 (D.C.1980) ("It is established in the District of Columbia that a landlord has a duty to use reasonable care to keep safe those common areas of the building retained under his control."). We have described a court's examination of whether a duty exists as a "foreseeability of harm test" that is determined, in large part, by the nature of the relationship between the parties:

> In determining the existence of a duty owed to a plaintiff, [courts] have applied a "foreseeability of harm" test, which is based on the recognition that duty must be limited to avoid liability for unreasonably remote consequences.... *Inherent also in the concept of duty is the relationship between the parties out of which the duty arises* .... [U]ltimately, the determination of whether a duty should be imposed is made by weighing the various policy considerations and reaching a conclusion that the plaintiff's interest[s] are, or are not, entitled to legal protection against the conduct of the defendant.

*Odemns v. District of Columbia,* 930 A.2d 137, 143 (D.C.2007) (alteration in original) (quoting *W.C. & A.N. Miller Co. v. United States,* 963 F.Supp. 1231, 1243 (D.D.C. 1997)). Thus, "the scope of the defendant's undertaking determines the scope of its duty," *Haynesworth,* 645 A.2d at 1098, by which we mean that the foreseeable risks associated with the defendant's failure to complete an undertaking provide the basis for the court's assessment of duty. Recently, we have even suggested that "the relationship between the parties is *the key* to determining whether the defendant had a legally enforceable duty to the plaintiff," *Bd. of Trs.,* 974 A.2d at 871 n. 1 (quoting *Workman v. United Methodist Comm.,* 355 U.S.App.D.C. 131, 137, 320 F.3d 259, 265 (2003)) (emphasis added), and that issues related to foreseeability might better be "confine[d] ... to the proximate cause analysis." *Id.* (citing PROSSER AND KEETON ON TORTS, *supra,* § 53, at 356).

 In general, therefore, there is only a minimal duty—if any—owed to a party who is at arms' length.[3] Once the defendant enters into a relationship with the plaintiff, however, a corresponding duty of care arises. *See, e.g., Tolu v. Ayodeji,* 945 A.2d 596, 603 (D.C.2008) ("In negligence actions the standard of care by which the defendant's conduct is measured is often stated as 'that degree of care which a reasonably prudent person would have exercised under the same or similar circumstances.'" (quoting *Morrison v. MacNamara,* 407 A.2d 555, 560 (D.C.1979))); *Giordano v. Sherwood,* 968 A.2d 494, 498 (D.C.2009) (discussing the national stan-

---

**3.** "There are ... a good many defendants, and a good many situations, as to which there is no such duty [to exercise the care of a reasonable person]. In other words, the defendant is under no legal obligation toward the particular plaintiff to act with the care of a reasonable [person], and he is not liable even though his conduct falls short of that standard, and the other is injured as a result." PROSSER AND KEETON ON TORTS, *supra,* § 53, at 358.

dard of care applicable in medical malpractice claim against a surgeon). If the applicable standard of care is breached, the person to whom the duty is owed may recover for damages proximately caused by the negligence, including damages for physical injury, monetary loss, and ancillary or "parasitic" damages for related mental distress (sometimes referred to as "pain and suffering"). *See, e.g., Washington & Georgetown R.R. Co. v. Dashiell,* 7 App.D.C. 507, 514 (1896) ("Where a party has suffered physical injury, it seems to be well settled, that mental pain and suffering, attendant upon and as a natural incident of such bodily injury, may be considered as an element in estimating the damages.").

## II. Development of the Tort of Negligent Infliction of Emotional Distress

Claims of negligence that seek damages for only mental pain and suffering (independent of any physical injury) historically have been analyzed under a different framework, however. Here, as in other jurisdictions, courts have long been reluctant to hold defendants liable when their negligence causes emotional distress without accompanying physical injury.[4] Courts' historic skepticism of emotional distress claims focused on three concerns: avoiding fictitious or trivial claims, the difficulty of establishing (or disproving) the nature and extent of the alleged mental injury, and limiting liability. *See, e.g.,* RE-STATEMENT (SECOND) OF TORTS, *supra,* §§ 46 cmt. b (discussing the tort of intentional infliction of emotional distress), 436A cmt.

b (discussing the tort of negligent infliction of emotional distress).

Thus, over a century ago, in *Washington & Georgetown R.R. Co.,* the Court of Appeals of the District of Columbia considered and rejected a claim for damages resulting from "impairment of the plaintiff's nervous system," explaining:

*We know that, from repeated scares or frights, persons are liable to have their sensibilities easily, and in some cases morbidly excited, and that seems to be the case here. But the law furnishes no remedy for such sensitive condition. To attempt to furnish a legal remedy in such case, would open the door to the wildest speculation. Without for a moment intimating that simulation existed in this case, yet the nature of such claim would render it easy of simulation; and if not simulated, the temptation would be strong to exaggeration, and the assigning of one cause for another in the production of the morbid state of the nervous sensibilities; and all this, though it might be without real foundation, would be most difficult to disprove by the party sought to be charged.*

7 App.D.C. at 515 (emphasis added).[5] These concerns led the Court of Appeals for the District of Columbia to unequivocally assert, in 1939, that "[t]he law does not ... impose a general duty of care to avoid causing mental distress." *Clark v. Associated Retail Credit Men,* 70 App.D.C. 183, 185, 105 F.2d 62, 64 (1939). As should be clear, the different treatment accorded claims of mental distress is not based on a straightforward application of the tradi-

4. *See* STUART M. SPEISER, CHARLES F. KRAUSE, & ALFRED W. GANS, THE AMERICAN LAW OF TORTS § 16:1 (2009); HANDBOOK OF THE LAW OF TORTS, *supra,* § 54.

5. *See also Perry v. Capital Traction Co.,* 59 App. D.C. 42, 44, 32 F.2d 938, 940 (1929) (rejecting a tort claim based on "nervous

shock or fright" because "mere fright is easily simulated and difficult to disprove, and that impairment of the nervous system is of such an intangible character that there is no practical standard by which the extent of the impairment may be determined").

tional principles of negligence discussed in the previous section. Rather, by framing the question in terms of "duty," instead of proximately caused damages, courts have purposely developed the common law to balance competing societal interests. In the words of the *Clark* court: "For the sake of reasonable freedom of action, in our own interest and that of society, we need the privilege of being careless whether we inflict mental distress on our neighbors." *Clark*, 70 App.D.C. at 185, 105 F.2d at 64.[6]

## A. The "Physical Impact" Requirement

Having rejected a "general" duty of care to avoid causing emotional distress, courts, including in this jurisdiction, have imposed liability for the negligent infliction of emotional distress only in limited situations, when additional factors are present that avoid or mitigate the three policy concerns outlined above. In the District of Columbia, our definition of the tort of negligent infliction of emotional distress has evolved over the years. In its earliest iteration, we followed the "physical impact" rule, which permits recovery for negligently inflicted emotional distress if the distress results from a physical impact and is accompanied by physical injury. *See Asuncion v. Columbia Hosp. for Women*, 514 A.2d 1187, 1188–89 (D.C.1986) (citing cases going back to 1929, *e.g., Perry*, 59 App. D.C. at 44, 32 F.2d at 940); *Washington & Georgetown R.R. Co.*, 7 App.D.C. at 514–15. The physical impact requirement, although *de minimis, see Asuncion*, 514 A.2d at 1189 ("minimal physical impact" requirement was satisfied by the "mere presence" of post-procedure medical gauze in a patient's body), was thought to provide some guarantee of the legitimacy of the mental harm alleged and thereby deter frivolous claims. *See id.* at 1189 n. 1; *Williams*, 572 A.2d at 1065.

## B. The "Zone of Physical Danger" Rule

■ In *Williams v. Baker*, this court, sitting en banc, abandoned the "physical impact" requirement in favor of the more liberal "zone of physical danger" rule, which permits recovery for mental distress if the defendant's actions caused the plaintiff to be "in danger of physical injury" and if, as a result, the plaintiff "feared for his own safety."[7] 572 A.2d at 1066. In addi-

6. *See also* PROSSER AND KEETON ON TORTS, *supra*, § 12, at 56 (discussing the tort of intentional infliction of emotional distress and explaining that "[t]he most cogent objection to the protection of such interests lies in the 'wide door' which might be opened, not only to fictitious claims, but to litigation in the field of trivialities and mere bad manners").

7. In *Williams*, a mother brought suit against her son's doctor, Dr. Mark Baker, alleging that he had been negligent in failing to diagnose her son with acute epiglottitis. 572 A.2d at 1063. Williams had brought her son to Dr. Baker's office because he had a sore throat, was gagging, and had a high fever. *Id.* Dr. Baker diagnosed Williams's son as suffering from a minor virus and sent him home. *Id.* Later that evening, however, he began to cough severely and eventually stopped breathing. *Id.* Williams took her son to the emer-

gency room at Children's Hospital, where he was hospitalized for ten days. *Id.* Williams, who had accompanied her son throughout the entire episode, alleged that she had suffered "extreme anxiety" during her son's hospitalization, that she could not eat or sleep for several days after he was hospitalized, and that she suffered from sleeplessness, severe stomach problems, nausea, and diarrhea during the following months. *Id.* We concluded that the appellant in *Williams*—who alleged that her mental distress was caused by fear for the safety of her son—had not presented a viable claim for negligent infliction of emotional distress because recovery was limited to "direct victims" of a tortious act, *i.e.*, claimants who were put in fear for their own safety and health, and the mother was not herself at risk of physical danger. *Id.* at 1067.

tion, we said, the alleged emotional distress must be " 'serious' and 'verifiable.' " *Id.* at 1068 (quoting *Bovsun v. Sanperi,* 61 N.Y.2d 219, 473 N.Y.S.2d 357, 461 N.E.2d 843, 849 (1984)). Under the rule set forth in *Williams,* the plaintiff no longer needed to show that her emotional distress was the result of a "physical impact." *Id.* at 1067.

In rejecting the physical impact requirement, we asserted that two of the earlier objections to emotional distress claims— distrust of the available proof of mental distress and the related fear of frivolous claims—no longer presented compelling reasons for courts to impose such strict legal limitations on the scope of an actor's duty. As we explained:

> [R]equiring physical impact is no longer a necessary safeguard against fraudulent claims. Due to advances in medical research and improved diagnostic techniques, the presence of emotions such as grief, anxiety, and anger is frequently accompanied by physical indicia that are capable of objective proof.
>
> . . . .
>
> "It appears completely inconsistent to argue that the medical profession is absolutely unable to establish a causal connection in the case where there is no impact at all, but that the slightest impact ... suddenly bestows upon our medical colleagues the knowledge and facility to diagnose the causal connection

between emotional states and physical injuries."

*Id.* at 1067 (alteration in original) (quoting *Niederman v. Brodsky,* 436 Pa. 401, 261 A.2d 84, 87 (1970)). Therefore, "[o]nce the physical consequences of fright are recognized as deserving of legal protection, it would be arbitrary to limit compensation to instances in which there has been an impact." *Id.* One year after *Williams* was decided, we clarified that although the plaintiff's emotional injury must be "serious and verifiable," the plaintiff need not experience a physical manifestation of the mental injury. *Jones v. Howard Univ., Inc.,* 589 A.2d 419, 424 (D.C.1991).

While recognizing that it no longer made sense to disqualify claims of emotional distress as a class, *Williams* noted that one concern remained: even if legitimate, claims for emotional distress resulting from negligent conduct might be nearly limitless if we were to rely on traditional negligence principles of foreseeability to determine the scope of the negligent actor's liability.[8] We concluded that the benefit of providing a remedy for legitimate tortious wrongs had to be balanced against the danger of "imposing virtually infinite liability based on foreseeability when the conduct is merely negligent."[9] *Williams,* 572 A.2d at 1069. Thus we declined to follow the "foreseeability of risk test" adopted by the California Supreme Court in *Dillon v. Legg,* 68 Cal.2d 728, 69 Cal. Rptr. 72, 441 P.2d 912 (1968).[10] *Williams,*

---

**8.** The Supreme Court of the United States has explained that this concern of "unpredictable and nearly infinite" liability is independent of and "has nothing to do with the potential for fraudulent claims; on the contrary, it is based upon the recognized possibility of *genuine* claims from the essentially infinite number of persons, in an infinite variety of situations, who might suffer real emotional harm as a result of a single instance of negligent conduct." *Consol. Rail Corp. v. Gottshall,* 512 U.S. 532, 552, 114 S.Ct. 2396, 129 L.Ed.2d 427 (1994).

**9.** The Restatement suggests that the negligent actor's lesser culpability, compared with that of an intentional or reckless actor, is another reason for limiting liability for emotional distress that results from negligence. *See* RESTATEMENT (SECOND) OF TORTS, *supra,* § 436A cmt. b.

**10.** In *Dillon,* the California Supreme Court considered a claim brought by a mother for emotional distress that followed from witnessing the death of her child. Margery Dillon was crossing the street with her daughter

572 A.2d at 1070 ("If foreseeability be the sole test, then once liability is extended the logic of the principle would not and could not remain confined." (quoting *Tobin v. Grossman*, 24 N.Y.2d 609, 301 N.Y.S.2d 554, 249 N.E.2d 419, 423 (1969))).[11] We decided, therefore, that a rule requiring that the defendant's conduct place the plaintiff in a "zone of physical danger" was a necessary and logical alternative to a rule that relied on foreseeability alone. We reasoned that "liability in tort law is based on a breach of duty and it is rational to postulate that the tortfeasor owes a duty of care only to those who are physically endangered by the tortfeasor's negligent act." *Id.* at 1072. In conclusion, we adopted the position expressed by the New York Court of Appeals:

> The zone-of-danger rule provides a circumscribed alternative to the apparently sweeping liability recognized in *Dillon v. Legg*, and does so within the framework of traditional and accepted negligence principles by using an objective test of whether the plaintiff was unreasonably threatened with bodily harm by the conduct of the defendant. . . .

*Id.* at 1073 (quoting *Bovsun*, 473 N.Y.S.2d 357, 461 N.E.2d at 848). *See also id.* at 1066 (citing with approval a similar rule in the RESTATEMENT (SECOND) OF TORTS § 436(2) (1977)). Following our decision in *Williams*, we have emphasized that the "zone of physical danger test" is the "sole means for assessing a claim for damages for negligently inflicted emotional distress." *Washington v. John T. Rhines Co.*, 646 A.2d 345, 347–48 (D.C.1994).

## C. Application of the "Zone of Physical Danger" Rule

Because *Williams* limits recovery to "direct" victims of the tortfeasor's negligence, *i.e.*, those who are distressed by "fear for his [or her] own safety as opposed to the safety of a third party," 572 A.2d at 1066 n. 12, see also *supra* note 7, we have subsequently denied claims brought by bystanders who witnessed harm to another, but did not fear for their own safety. *See Johnson v. District of Columbia*, 728 A.2d 70 (D.C.1999) (mother's distress as a result of watching her child being scalded in bathtub); *Washington*, 646 A.2d at 348 (claim against funeral home for mishandling of spouse's corpse); *McKethean v. Washington Metro. Area Transit Auth.*, 588 A.2d 708 (D.C.1991) (bystander distress after witnessing several relatives die in automobile accident at bus stop). And because *Williams* required that the victim

---

when the defendant, David Legg, drove his car across an intersection and struck and killed Dillon's young daughter. 69 Cal.Rptr. 72, 441 P.2d at 914. The California court held that Dillon had a cause of action because "the negligent driver who causes the death of a young child may reasonably expect that the mother will not be far distant and will upon witnessing the accident suffer emotional trauma." *Id.*, 69 Cal.Rptr. 72, 441 P.2d at 921. The court stated that three factors should guide the determination whether alleged mental distress was "reasonably foreseeable" in such circumstances: (1) the proximity of the plaintiff to the incident; (2) whether the mental distress was contemporaneous with the plaintiff's observation of the incident; and (3) the blood relationship between the plaintiff and the victim. *Id.*, 69 Cal.Rptr. 72, 441 P.2d at 919–20.

**11.** The California Supreme Court has subsequently added limiting requirements to the "foreseeability" test articulated in *Dillon*. *See Thing v. La Chusa*, 48 Cal.3d 644, 257 Cal.Rptr. 865, 771 P.2d 814, 829–30 (1989) (holding that "a plaintiff may recover damages for emotional distress caused by observing the negligently inflicted injury of a third person if, but only if, said plaintiff: (1) is closely related to the injury victim; (2) is present at the scene of the injury producing event at the time it occurs and is then aware that it is causing injury to the victim; and (3) as a result suffers serious emotional distress").

be in a "zone of physical danger" even when claims of emotional distress were brought by "direct" victims of negligent acts, we have permitted such claims to proceed only in those instances where there was evidence that the plaintiff's concern for her own safety or health arose from being in a "zone of physical danger" created by the defendant's negligent conduct: where the plaintiff was in close proximity to gunshots that killed her son, *District of Columbia v. Evans*, 644 A.2d 1008 (D.C.1994); where there was evidence that the plaintiff might have consumed a foreign object (a worm) in her food, *Sowell v. Hyatt Corp.*, 623 A.2d 1221 (D.C.1993); and where the pregnant plaintiff had undergone X-rays and a gallbladder operation causing her to fear injury to herself and the twins she had been carrying, *Jones*, 589 A.2d 419.[12] In every other case, we rejected claims made by direct victims because they failed to establish that they were placed in physical danger by the defendant's alleged negligence. See *Minch v. District of Columbia*, 952 A.2d 929, 941–42 (D.C.2008) (rejecting claim brought by murder suspect who alleged emotional distress as a result of mistreatment during negligent police investigation); *Jane W. v. President & Dirs. of Georgetown Coll.*, 863 A.2d 821, 828 (D.C. 2004) (rejecting claim brought by patients after they were informed that a radiology technician had substituted certain syringes that contained only saline solution for syringes that should have contained pain medication); *Drejza v. Vaccaro*, 650 A.2d 1308, 1312 n. 9 (D.C.1994) (rejecting claim by rape victim subjected to verbal abuse during investigation by police officer at police station); cf. *Morgan v. Psychiatric Inst. of Washington*, 692 A.2d 417 (D.C.1997) (recognizing emotional distress claim brought by patient who argued that sexual intimacy with psychotherapist provided sufficient evidence of actual physical injury to withstand motion for summary judgment). In short, since *Williams*, we have applied the zone of physical danger test to *all* negligence actions where the only injury claimed was mental or emotional distress, regardless of the context in which the claim arose.[13]

### III. Emotional Distress Damages in Established Relationships

In this appeal, appellant urges us to abandon our reliance upon the "zone of physical danger" test as the *sole* means of recovery for the tort of negligent infliction

---

**12.** *Williams* made clear that a direct victim who was in the "zone of physical danger" may also seek compensation for distress caused by "fear for the safety of a member of the plaintiff's immediate family who was endangered by the negligent act." 572 A.2d at 1069. The principle underlying this rule is that "[h]aving breached a duty of care to the plaintiff, the negligent tortfeasor should be held liable for all resultant damages." *Id.* (citing *Bovsun*, 473 N.Y.S.2d 357, 461 N.E.2d at 847; RESTATEMENT (SECOND) OF TORTS, *supra*, § 436(3)).

**13.** A close reading of the facts and analysis in *Williams* might suggest that, once the plaintiff's claim had been rejected because she was not a direct victim (*i.e.*, she did not fear for her own health and safety), it was unnecessary to further require that she had been placed in a "zone of physical danger." In many cases, the two are linked, as the plaintiff's distress will have been caused by fearing for her own *physical* health or safety, as a result of having been placed in physical danger. It is conceivable, however, that a claimant could be a direct victim, but that her fear for her own safety could result from having been placed in a zone of psychological rather than physical danger. As discussed in the text, we have interpreted both aspects of *Williams*—the direct victim and zone of physical danger requirements—as binding precedent and applied the two requirements across the board.

of emotional distress.[14] Specifically, appellant and *amicus* supporting his claim argue that recovery also should be permitted in those cases where the negligent actor has a relationship or has committed to an undertaking with the plaintiff of such nature that negligent performance of a legal obligation to the plaintiff is very likely to cause serious emotional harm, and, in fact, does so. The question is not whether the "zone of physical danger" rule should be jettisoned and replaced with the proposed "relationship" or "undertaking" rule in every case. Rather, the issue presented in this appeal is whether—in addition to permitting recovery based on the "zone of physical danger" rule—the law should allow courts to conclude that a defendant has assumed a duty to avoid inflicting emotional distress in certain cases where the underlying relationship or undertaking is such that it is not only foreseeable, but especially likely, that the defendant's negligence will cause serious emotional distress to the plaintiff. For the reasons we now discuss, we agree with appellant, and adopt a supplemental rule, as defined in this opinion.

## A. The Proposed Special Relationship or Undertaking Rule

Appellant's argument that the "zone of physical danger" rule should not be the sole route for recovery in all cases seeking damages for serious emotional distress finds support in Section 46 of the draft RESTATEMENT (THIRD) OF TORTS:

§ 46 Negligent Conduct Directly Inflicting Emotional Disturbance on Another

An actor whose negligent conduct causes serious emotional disturbance to another is subject to liability to the other if the conduct:

(a) places the other in immediate danger of bodily harm and the emotional disturbance results from the danger; or

(b) occurs in the course of specified categories of activities, undertakings, or. relationships in which negligent conduct is especially likely to cause serious emotional disturbance.

RESTATEMENT (THIRD) OF TORTS § 46 (Tentative Draft No. 5, 2007) (hereinafter, "draft Third Restatement").[15] Subsection (a) of Section 46, which refers to "immediate danger of bodily harm," corresponds to the *Williams* "zone of physical danger" rule. Subsection (b), which refers to "specified categories of activities, undertakings, or relationships in which negligent conduct is especially likely to cause serious emotional disturbance," would encompass claims, such as appellant's, which arise from a doctor-patient relationship in which the doctor negligently misdiagnosed the patient with a grave illness, with the likely result that it would (and did) cause serious emotional distress. Thus, as articulated by the drafters of § 46 of the draft Third Restatement, a rule that finds a duty based upon "undertakings or relationships" is a supplement to—rather than a substitute for—the "zone of physical danger" rule that permits recovery in the absence of such a relationship. Under either test, only direct victims of the actor's negligence can recover.[16]

---

**14.** Appellant meets *Williams's* other requirement that the claimant be a direct victim of the tortious conduct, and so he does not challenge that aspect of the holding.

**15.** Although we draw upon the draft Third Restatement's Section 46 and commentary in our analysis, we do not adopt the comments of the draft Restatement in their entirety; for

now we adopt only those comments of the draft Restatement that are expressly made a part of this opinion.

**16.** A different section of the draft Third Restatement addresses liability for emotional distress to bystanders, *i.e.,* those who suffer emotional distress that results not from fear

Section 46 of the draft Third Restatement has evolved from the current version of the Second Restatement, issued in 1977, which relies upon the plaintiff having suffered actual physical injury as a limitation on potential claims for emotional distress. Indeed, the zone of physical danger test set forth in the Second Restatement is more restrictive than the one we have adopted in this jurisdiction, as it requires that the plaintiff suffer physical injury as a result of the alleged emotional distress.[17] In *Williams*, when we cited the Second Restatement's endorsement of the zone of physical danger rule as support for our decision to abandon the physical impact requirement, *see* 572 A.2d at 1066, we did not decide "whether one who is physically endangered by [a] defendant's negligence may recover for ... emotional distress in the absence of physical injury." *Id.* at 1067. But in 1991, the year after we decided *Williams*, we clarified that our definition of the tort of negligent infliction of emotional distress does not require that the plaintiff suffer physical injury. *Jones*, 589 A.2d at 424.

The draft Third Restatement, which has been under consideration since 1996, removes the physical injury requirement from the "zone of physical danger" rule (as we did in 1991) and adds "specified categories of activities, undertakings, or relationships" as additional bases for establishing a defendant's liability for emotional distress. These changes are intended to reflect developments in the law, specifically the "line of cases [that] recognizes an exception to the general no-liability rule when an actor undertakes to perform specified obligations, engages in specified activities, or is in a specified relationship fraught with the risk of emotional disturbance." RESTATEMENT (THIRD) OF TORTS, *supra*, § 46 cmt. b. The drafters justify this additional basis for establishing a duty on the ground that "[l]imiting recovery for emotional harm to those in the relationship or those for whom the undertaking or activity was being performed limits the scope of liability for negligently inflicted emotional harm, thereby avoiding concern about indeterminate and excessive liability." *Id.*

Professor Dobbs's modern treatise on torts explains why such a rule addresses the problem of potentially infinite liability

---

for their own safety, but from the injury and suffering of another person who is close to them. Restatement § 47 provides: "An actor who negligently causes serious bodily injury to a third person is subject to liability for serious emotional disturbance thereby caused to a person who: (a) perceives the event contemporaneously, and (b) is a close family member of the person suffering the bodily injury." RESTATEMENT (THIRD) OF TORTS, *supra*, § 47. This rule is modeled after the rule adopted by the California Supreme Court in *Dillon*, 69 Cal.Rptr. 72, 441 P.2d 912. *See* RESTATEMENT (THIRD) OF TORTS, *supra*, § 47 cmt. a. It arguably would permit the claims that were rejected in *McKethean*, 588 A.2d 708, and *Johnson*, 728 A.2d 70. As noted, appellant's claim does not present the issue of liability to bystanders and we therefore do not address it in this opinion, other than to note that it is a separate but related issue.

17. The relevant section of the Second Restatement provides: "If the actor's conduct is negligent as creating an unreasonable risk of causing bodily harm to another otherwise than by subjecting him to fright, shock, or other similar and immediate emotional disturbance, the fact that such harm results solely from the internal operation of fright or other emotional disturbance does not protect the actor from liability." RESTATEMENT (SECOND) OF TORTS, *supra*, § 436(2). The Second Restatement makes clear that some physical injury is required in order to impose liability: "If the actor's conduct is negligent ... and it results in ... emotional disturbance alone, without bodily harm or other compensable damage, the actor is not liable for such emotional disturbance." *Id.* § 436A.

that has been of central judicial concern in emotional distress cases:

> When the defendant owes an independent duty of care to the plaintiff, there is no risk of unlimited liability to an unlimited number of people. Liability turns solely on relationships accepted by the defendant, usually under contractual arrangement. Consequently, the duty extends only to those for whom the contract was made.... For these two reasons, the zone of danger and contemporaneous awareness rules are not needed to limit liability to an appropriate sphere.

PROSSER AND KEETON ON TORTS, *supra,* § 312, at 849 (discussing the rule adopted by California in *Burgess v. Superior Court,* 2 Cal.4th 1064, 9 Cal.Rptr.2d 615, 831 P.2d 1197 (1992)). We agree with the draft Third Restatement and Professor Dobbs's observation that no special rule (such as the zone of physical danger test) is necessary to guard against the risk of imposing a duty that might be unlimited or unreasonable when emotional harm is especially likely to be caused as a direct result of negligent performance of a duty to avoid such harm owed to a specific person. Such a duty can, but need not, arise from a contractual arrangement between the parties.[18] The key point is that the requirement of a special relationship between the parties or undertaking by the defendant to the plaintiff limits the scope of the defendant's potential liability to identifiable persons, rendering the "zone of physical danger" requirement unnecessary to achieve that purpose.

Indeed, a number of courts around the country have held that a defendant has a duty to avoid causing emotional distress to a plaintiff if the defendant has undertaken an obligation to benefit the plaintiff *and* if that undertaking, by its nature, creates not only a foreseeable, but an especially likely, risk that the defendant's negligent performance of the obligation will cause serious emotional distress. This means that not every existing relationship or undertaking will suffice to create a duty to avoid the negligent infliction of emotional distress. Thus, courts consider the nature of the relationship between the parties and the likelihood that emotional distress will be caused by negligent performance of a recognized obligation before permitting stand-alone claims for emotional distress. *See, e.g., Taylor v. Baptist Med. Ctr., Inc.,* 400 So.2d 369, 374 (Ala.1981) ("[W]here the contractual duty or obligation is so coupled with matters of mental concern or solicitude, or with the feelings of the party to whom the duty is owed, that a breach of that duty will necessarily or reasonably

---

**18.** Although the District of Columbia does not allow consequential damages for emotional distress in a breach of contract action, *see Howard Univ. v. Baten,* 632 A.2d 389 (D.C. 1993), the existence of a contract can be evidence of the special relationship or undertaking that may give rise to tort liability. The existence of a contractual relationship *vel non* does not determine whether a claim for emotional distress damages will be cognizable in tort; that will depend on whether the plaintiff can prove the elements of the tort of negligent infliction of emotional distress that we set out in this opinion. The extent to which tort claims could be disclaimed, liquidated or otherwise limited by contract is beyond the scope of this opinion. We note, however, that we generally permit exculpatory clauses so long as they do not purport to waive liability for gross negligence, fraud or other willful wrongful conduct. *See Carleton v. Winter,* 901 A.2d 174, 181 (D.C.2006). Such clauses may not be valid, however, in the context of transactions that affect the public interest. *See Wolf v. Ford,* 335 Md. 525, 644 A.2d 522, 525–26 (1994) (citing *Tunkl v. Regents of Univ. of Cal.,* 60 Cal.2d 92, 32 Cal.Rptr. 33, 383 P.2d 441, 495–46 (1963) (holding that release of patient's claims for negligent and wrongful conduct in hospital's pre-admission form was against public policy and not enforceable)).

result in mental anguish or suffering, it is just that damages therefore be taken into consideration and awarded." (quoting *Stead v. Blue Cross–Blue Shield of Alabama*, 346 So.2d 1140, 1143 (Ala.1977)); [19] *Chizmar v. Mackie*, 896 P.2d 196, 203 (Alaska 1995) ("[W]henever a defendant stands in a contractual or fiduciary relationship with the plaintiff and the nature of this relationship imposes on the defendant a duty to refrain from conduct that would foreseeably result in emotional harm to the plaintiff, the plaintiff need not establish a physical injury in order to recover for the negligent infliction of emotional distress."); *Burgess*, 9 Cal.Rptr.2d 615, 831 P.2d at 1202 (noting that "a cause of action to recover damages for negligently inflicted emotional distress will lie ... in cases where a duty arising from a preexisting relationship is negligently breached" and explaining that the "[f]oreseeability and certainty of [a] mother's [emotional] injury in labor and delivery cases" is a policy consideration that favors liability); *Corgan v. Muehling*, 143 Ill.2d 296, 158 Ill.Dec. 489, 574 N.E.2d 602, 607 (1991) ("[T]he nature of the therapist-patient relationship gives rise to duty on behalf of the therapist to refrain from activity which carries with it a foreseeable, and unreasonable, risk of causing emotional or mental harm to the patient."); *Oswald v. LeGrand*, 453 N.W.2d 634, 639

(Iowa 1990) (noting an exception to the rule requiring physical impact where there is a contract and "the nature of the relationship between the parties is such that there arises a duty to exercise ordinary care to avoid causing emotional harm"); [20] *Clomon v. Monroe City Sch. Bd.*, 572 So.2d 571, 575 (La.1991) (discussing "rules or decisions permitting recovery for emotional distress from a tortfeasor who owed the plaintiff a special, direct, duty created by law, contract, or special relationship"); *Menorah Chapels v. Needle*, 386 N.J.Super. 100, 899 A.2d 316, 324 (App.Div.2006) (allowing recovery based on contract "where the subject-matter of the contract is such as to make it certain or reasonably probable that the parties had in contemplation, at the time of the making of the contract, a pecuniary satisfaction for the anguish and distress of mind ensuing from a breach of its terms"); [21] *Johnson v. State*, 37 N.Y.2d 378, 372 N.Y.S.2d 638, 334 N.E.2d 590, 592 (1975) (recognizing a cause of action where there is "an especial likelihood of genuine and serious mental distress, arising from ... special circumstances, which serves as a guarantee that the claim is not spurious"); *Curtis v. MRI Imaging Servs. II*, 327 Or. 9, 956 P.2d 960, 963 (1998) ("Where the standard of care in a particular medical profession recognizes the possibility of adverse psychological reactions or consequences as a medical con-

---

**19.** Alabama does not recognize the separate tort of negligent infliction of emotional distress. *Allen v. Walker*, 569 So.2d 350 (Ala. 1990).

**20.** Iowa courts have recognized emotional distress claims relating to: a mother's distress caused by negligent treatment during the birth of her premature child, *Oswald*, 453 N.W.2d at 639; negligent transmission and delivery of telegrams announcing the death of a close relative, *Cowan v. W. Union Tel. Co.*, 122 Iowa 379, 98 N.W. 281 (1904), *Mentzer v. W. Union Tel. Co.*, 93 Iowa 752, 62 N.W. 1 (1895); and the negligent performance of fu-

neral services, *Meyer v. Nottger*, 241 N.W.2d 911 (Iowa 1976); *cf. Overturff v. Raddatz Funeral Servs., Inc.*, 757 N.W.2d 241 (Iowa 2008) (plaintiff's claims for emotional distress barred because plaintiff had no contractual relationship with funeral home).

**21.** *See also Muñiz v. United Hosps. Med. Ctr. Presbyterian Hosp.*, 153 N.J.Super. 79, 379 A.2d 57, 58 (App.Div.1977) (recognizing possibility of claim for relief based on violation of an implied contract with the hospital where parents alleged that hospital negligently informed them of the death of their child).

cern and dictates that certain precautions be taken to avoid or minimize it, the law will not insulate persons in that profession from liability if they fail in those duties."); *Boyles v. Kerr*, 855 S.W.2d 593, 600 (Tex. 1993) ("certain relationships may give rise to a duty which, if breached, would support an emotional distress award"); [22] *Larsen v. Banner Health Sys.*, 81 P.3d 196, 203 (Wyo.2003) (recovery exists "in circumstances involving contractual services that carry with them deeply emotional responses in the event of breach"). These cases recognize the principle that "[w]hen defendants have undertaken care for the plaintiff that includes care for emotional well-being, a ground for liability comes into play that is far different from the ground upon which stranger liability is based. The undertaking itself should determine the defendant's duty and its extent, just as it does in other tort cases where liability is based on undertakings." Dan B. Dobbs, *Undertakings and Special Relationships in Claims for Negligent Infliction of Emotional Distress*, 50 ARIZ. L.REV. 49, 54 (2008) (hereinafter *Undertakings and Special Relationships*). In situations where such an undertaking is established, the plaintiff can recover damages for emotional distress caused by the defendant's breach of a duty of care that is defined in accordance with traditional precepts of negligence law; for example, where there is an allegation of medical malpractice, by reference to the national standard of care. *See, e.g., Cárdenas v. Muangman*, 998 A.2d 303, 306 (D.C.2010).

## B. Shortcomings of the "Zone of Physical Danger" Rule Where There Is an Established Relationship or Undertaking

■ *Williams* is correct that "it is *rational* to postulate that the tortfeasor owes a duty of care only to those who are physically endangered" by the negligent act, 572 A.2d at 1072 (emphasis added), and we reiterate that it is the general rule in light of the policy concern against the imposition of potentially unlimited liability for emotional harm. We are convinced, however, that physical endangerment is not the *most reasonable* method of determining the tortfeasor's duty in all cases, and that it can lead to (and has led to) inconsistent and untoward results in some cases.[23]

As already discussed, *Williams* and its progeny dispensed with the notion that emotional distress must be accompanied by physical injury if the plaintiff is to recover damages, *see Williams*, 572 A.2d at 1067; *Jones*, 589 A.2d at 424, but required the plaintiff to show that she was in physical danger and that she reasonably feared for her own safety as a precondition for recovery of mental distress damages, as a prudential safeguard against the imposition of limitless liability for emotional harm.

In certain cases, however, application of the "zone of physical danger" rule has led

**22.** *Accord Freeman v. Harris Cnty.*, 183 S.W.3d 885, 890 (Tex.Ct.App.2006) (noting that "[s]pecial relationship cases generally have three common elements: (1) a contractual relationship between the parties, (2) a particular susceptibility to emotional distress on the part of the plaintiff, and (3) the defendant's knowledge of the plaintiff's particular susceptibility to the emotional distress, based on the circumstances"); *but see Johnson v. Methodist Hosp.*, 226 S.W.3d 525, 530 (Tex.

Ct.App.2006) (holding that mother who was misdiagnosed as being HIV positive during her eighth month of pregnancy and subsequently treated for HIV did not have a "special relationship" with the hospital that was responsible for the misdiagnosis and delivered her child).

**23.** *See generally Undertakings and Special Relationships, supra,* at 57–58.

to results that depart from those that would have obtained under the "framework of traditional and accepted negligence principles" we cited in support of our decision to adopt the rule. *Williams*, 572 A.2d at 1073 (quoting *Bovsun*, 473 N.Y.S.2d 357, 461 N.E.2d at 848). In *Washington*, for example, we upheld the dismissal of a widow's complaint alleging that she had suffered emotional distress as a result of a funeral home's mishandling of her dead husband's corpse in preparation for an open-casket service. 646 A.2d at 345–47. Even though the funeral home owed a defined duty to the plaintiff established by contract and it was foreseeable and likely that she would suffer emotional injury as a result of the funeral home's failure to properly embalm her husband's body,[24] we concluded that she had not set forth a cognizable claim based on the physical zone of danger test set forth in *Williams* because the complainant could not allege that she had been in physical danger or had feared for her own safety.

*Id.* at 348–49. Application of the physical zone of danger test in *Washington* not only deprived the plaintiff from presenting her case even though her complaint pled all the traditional requirements for a finding of liability for negligence—duty, breach, causation and damages—but also effectively immunized the funeral home from liability for the injury most likely to be caused by its negligence: serious emotional distress in a situation fraught with emotional feelings of sorrow and loss.[25]

Three other cases are illustrative of the shortcomings of the zone of physical danger rule when applied to situations where there is a duty arising from an existing relationship. In *Jones*, we applied the "zone of physical danger" rule to a claim for emotional distress brought by a patient against the doctor and hospital that she claimed had negligently performed several X-rays as well as gallbladder surgery upon her while she was pregnant, in violation of the national standard of care. 589 A.2d at 420.[26] Had the patient claimed damages

24. According to the widow's complaint against the funeral home, when her husband's body arrived for an open-casket memorial service in Texas, "the clothing and the inside of the shipping case were drenched with fluid; there was an offensive odor of embalming and body fluids; there were extreme skin slips, blisters, and discolorations on several parts of the body; the body had begun to turn green and was rapidly decomposing; there was swelling in the face and neck areas; and a catheter tube which had been inserted in the deceased's body during his hospitalization had not been removed." 646 A.2d at 346.

25. Professor Dobbs discusses *Washington*, which he assesses as follows: "To make [the zone of danger] the basis for exculpating a gross mistreatment of the plaintiff's late husband is to say that undertakers are always immune from a duty of care. The undertaking was to the plaintiff and she was within the zone of emotional danger recognized by that undertaking. Cases like this would not survive a regime of law based upon a fair assessment of the duty undertaken by the mortuary,

even though strangers who undertook nothing would be under no duty at all." *Undertaking and Special Relationships, supra,* at 58. Prosser and Keeton likewise identify "two special groups" of cases where courts have allowed recovery for mental distress alone: those where a telegraph company has negligently transmitted a message, "especially one announcing death," and those involving the mishandling of a corpse by a funeral home or mortuary. Prosser and Keeton on Torts, *supra,* § 54, at 362. "What all of these cases appear to have in common *is an especial likelihood of genuine and serious mental distress, arising from the special circumstances,* which serves as a guarantee that the claim is not spurious." *Id.* (emphasis added).

26. When she arrived at the hospital, Jones informed the staff that she was twenty-five years old, that it had been about two months since her last period, and that she had stopped using birth control. 589 A.2d at 421. The hospital did not, however, administer a pregnancy test before she underwent the X-rays and gall bladder surgery, an omission

for physical injury as well as emotional distress, she would have been required to establish the usual elements of a negligence claim: that the defendants owed her a duty of care, that the applicable standard of care was breached, and that this breach of the standard of care was the cause of her injury. *See, e.g., Giordano,* 968 A.2d at 498 & n. 7. In *Jones,* the existence of the defendants' duty—which provides the "foundation of modern negligence law," *N.O.L. v. District of Columbia,* 674 A.2d 498, 499 n. 2 (D.C.1995)—was easily established by reference to the doctor-patient relationship between the plaintiff and the defendants. *See Jones,* 589 A.2d at 421 (assuming a duty in analyzing patient's claim of medical malpractice based on lack of informed consent). But because the plaintiff's injuries were exclusively emotional in nature, and even though we dispensed in that case with the requirement of showing physical manifestation of emotional distress, *id.* at 424, we were nonetheless compelled to set aside the parties' reasonable expectations flowing from the underlying doctor-patient relationship and, instead, analyzed the claims under the "zone of physical danger" test. We concluded that either the plaintiff's exposure to the X-rays or undergoing the gallbladder surgery while pregnant sufficed to meet the zone of physical danger test based on a theoretical risk of physical harm—even though she did not in fact suffer any physical injury. *Id.* at 422–24.

Similarly, in *Morgan,* 692 A.2d 417, we considered whether to apply the "zone of physical danger" test to a claim brought by a patient against her former therapist who breached the national standard of care by engaging in a sexual relationship with her while she was his patient. According to the plaintiff, she did not have the ability to consent to the sexual intimacy due to her drug addiction and the psychotherapist's manipulation of the well-understood "transference phenomenon," which leads a patient to project feelings under discussion onto the psychotherapist. *Id.* at 421 & n. 13. Relying on the old "physical impact" rule, we concluded that the zone of physical danger test did not need to be met because the plaintiff had alleged actual physical injury in the form of "unconsented" sexual contact. *Id.* at 421.[27] Although the particular circumstances in *Morgan* allowed the claim for negligent infliction of emotional distress to proceed without the need to satisfy the zone of physical danger rule, it must be recognized that breach of a psychotherapist's duty of care is less likely to place the patient in the "zone of physical danger"

which Jones alleged violated the applicable standard of care. *Id.* Approximately two weeks later, Jones learned that she was pregnant with twins. *Id.* The twins were born healthy; however, during her pregnancy Jones suffered emotional distress and anxiety as a result of her concern that the procedures had harmed her children and her fear that she might experience a spontaneous abortion or other complications, which were established risks. *Id.* Jones filed a complaint against her treating physician and hospital, alleging that they "were negligent in subjecting her to radiation without first performing appropriate tests for pregnancy or taking an adequate history that would have revealed that she was pregnant." *Id.*

**27.** The plaintiff in *Morgan* filed a claim against her former psychotherapist and the Psychiatric Institute of Washington, alleging that she had suffered emotional distress as a result of a sexual affair with her psychotherapist that lasted for over a year and resulted in a pregnancy. 692 A.2d at 419. The plaintiff alleged that she had become depressed when the psychotherapist ended their romantic relationship and that she could not sleep and had developed an eating disorder. *Id.* She also asserted that she suffered emotional and mental distress during her pregnancy and after the birth of their child. *Id.*

envisioned by *Williams* than to cause mental distress to a patient vulnerable to her therapist's breach of duty. That emotional injury could be severe even if unaccompanied by physical impact or endangerment. *See Corgan,* 158 Ill.Dec. 489, 574 N.E.2d at 606 (allowing patient's claim for "psychological malpractice" to proceed because the plaintiff had alleged facts sufficient to establish that the defendant psychologist "owed a duty to the plaintiff that should be enforced"); *cf.* PROSSER AND KEETON ON TORTS, *supra,* § 311, at 847 (criticizing cases that "treat physical danger as the single basis for emotional harm and at the same time in effect ignore the duties undertaken by health care professionals").

Finally, in *Sowell,* a restaurant patron claimed to have suffered emotional distress upon finding a worm in her lunch. *Sowell,* 623 A.2d at 1221.[28] Rather than analyzing the case in light of the established duty that a restaurant owes to its patrons, *see Novak v. Capital Mgmt. & Dev. Corp.,* 371 U.S.App.D.C. 526, 531, 452 F.3d 902, 907 (2006) ("It is fundamental and well-settled that a business invitor has a duty of care to its patrons while they are on its premises."), or considering whether the proper scope of that duty entails care for a patron's emotional well-being, application of the zone of physical danger rule led to reversal of the trial court's grant of summary judgment for the defendant because "[e]ating contaminated food is evidence of

physical endangerment." *Sowell,* 623 A.2d at 1225, 1226. We find it difficult to reconcile the different results in *Washington* (the funeral home case) and *Sowell* with society's expectations of the respective duties of the service providers in those cases and the magnitude of emotional harm reasonably likely to result from the defendants' negligence in performing those duties. Their divergent results are due to the application of the zone of physical danger rule as the sole vehicle for redress, without examination of the underlying relationship between the parties.

In *Washington, Jones, Morgan,* and *Sowell* there was an existing, legally recognized relationship between the parties, and the defendant owed a duty to the plaintiff, that would have offered traditional guidance to judicial determination whether the imposition of liability for the emotional distress resulting from the defendant's negligent conduct would be fair and reasonable under the circumstances. It would have been more in keeping with "accepted negligence principles," *Williams,* 572 A.2d at 1073, to examine the nature of the defendant's undertaking to the plaintiff and whether serious emotional distress was a likely consequence if the defendant breached that obligation, than to focus on the search for (sometimes elusive) "evidence of physical endangerment," *Sowell,* 623 A.2d at 1226,[29] as the best means

---

**28.** In *Sowell,* the restaurant patron noticed that there was a worm in a spoonful of rice that she was about to eat. 623 A.2d at 1222. Although she did not know whether she had eaten any portion of the worm, she began to vomit repeatedly. She was diagnosed with having an esophageal tear due to the vomiting and continued to have an "adverse reaction" to rice and to other foods that "cause[d] substantial recollection" of the incident. *Id.*

**29.** Recognizing that true emotional distress should be compensable, Maryland courts have interpreted the "physical injury" requirement

to include any injury that is capable of "objective determination." *Vance v. Vance,* 286 Md. 490, 408 A.2d 728, 734 (1979). Thus, "the term 'physical' is not used in its ordinary dictionary sense." *Id.* at 733–34. In *Vance,* which has been described as "the definitive Maryland case on mental distress as the basis of damages in negligent tort actions," *Belcher v. T. Rowe Price Found., Inc.,* 329 Md. 709, 621 A.2d 872, 884 (1993), the Court of Appeals of Maryland concluded that the plaintiff could recover because she developed an "objectively manifested, definite nervous disorder" after she found out that her marriage of

of recognizing the existence of a duty to avoid inflicting emotional distress.[30] Similarly, analysis of the claims that were dismissed in *Minch, Jane W.,* and *Drejza* because the plaintiffs in those cases were not in a zone of physical danger, discussed *supra,* would have included a further evaluation of the nature of the underlying relationship between the plaintiffs and defendants, along with consideration of public policy concerns applicable in those cases.[31]

## C. Consistency with General Principles of Negligence

The "zone of physical danger" test is a special rule that was adopted to permit some claims of negligent infliction of emotional distress—those that are closely linked to potential physical injury—while avoiding the socially unacceptable risk of imposing liability for causing mental distress to a potentially unlimited number of strangers. A rule that determines the defendant's duty to avoid emotional distress by reference to the nature of the defendant's relationship with or undertaking to identifiable persons is not a specially designed construct, but one that more closely (although not entirely) aligns with longstanding general principles regarding the tort of negligence. As discussed above, we regularly rely on the concepts of relationships and undertakings to determine the scope of the defendant's duty in physical injury cases. *See, e.g., Bd. of Trs.,* 974 A.2d at 870–75 (noting that "[t]here is general support for the practice of confining foreseeability questions to the proximate cause analysis and basing the duty analysis solely on the relationship between the parties").[32] Because "[m]ental injury is ... no less a real injury than 'physical' pain," PROSSER AND KEETON ON TORTS, *supra,* § 54, at 360,[33] we should analyze claims for emotional injury based on the principle of duty, relying on undertakings and relationships, that we normally use to examine claims for other types of negligently inflicted injury, unless there are compelling reasons to adopt a different approach. In *Jones, Morgan,* and *Sowell,* discussed above, the breach alleged was of an exist-

---

nearly twenty years was void as a result of her "husband's" failure to obtain a divorce from his previous wife. *Vance,* 408 A.2d at 734. The court found that this "nervous disorder" satisfied Maryland's "physical injury" requirement.

30. There is a question whether the elements of the zone of physical danger test were factually supported in *Sowell,* as the plaintiff could not show that she ate the worm or that doing so would have caused actual physical injury, rather than revulsion. If the elements were factually supported, the claim for emotional distress would be proper under *Williams,* even if it would fail under the supplemental rule we adopt in this opinion.

31. *Minch* and *Drejza* involved police officers in the performance of official investigatory duties, 952 A.2d at 941–42, 650 A.2d at 1314; in *Jane W.,* the court expressly referred to public policy reasons inherent in the hospital's mass mailing to notify patients—which distressed some of the recipients—of a hospi-

tal employee's misdeeds concerning their medication. 863 A.2d at 828.

32. *Cf. Bd. of Trs.,* 974 A.2d at 871 (noting that, in the special category of injury resulting from an intervening criminal act, "heightened foreseeability factors directly into the duty analysis because a defendant is only liable for the intervening criminal acts of another 'if the criminal act is so foreseeable that a duty arises to guard against it.'" (quoting *McKethean,* 588 A.2d at 717)).

33. Mental injury is ... no less a real injury than 'physical' pain; it is not an independent intervening cause, but a thing brought about by the defendant's negligence itself ... and while it may be true that its consequences are seldom very serious unless there is some predisposing physical condition, the law is not for protection of the physically sound alone. PROSSER AND KEETON ON TORTS, supra, § 54, at 360.

ing duty, but not all were of a nature that implicated the plaintiff's emotional well-being or equally likely to lead to serious mental distress. In *Jones,* the patient had given the hospital reason to think that she could be pregnant, from which the medical providers would expect that the patient would have a heightened anxiety once contraindicated procedures were performed, even if she was not, in fact, physically endangered. Similarly in *Morgan,* where a psychotherapist is engaged to assist the patient with issues affecting the mind and emotions, the therapist's manipulation of those emotions to forge an intimate relationship and then break it, also would lead the psychotherapist to expect that the patient would be severely distressed as a result, even if no physical harm was threatened. In *Sowell,* on the other hand, although the restaurant owed a duty to exercise reasonable care in the preparation of food served to its patrons and could be expected to anticipate that a patron would react with revulsion at discovering a disgusting item in the food she was served, it was not charged with safeguarding the emotional health of its customers, and would not be expected to foresee the severe reaction of this particular customer who was not put at serious (if any) health risk. In *Washington,* the services the funeral home was engaged to render were intended for the comfort of the deceased's surviving family and friends, and its negligence was alleged to have caused severe distress to the widow that it should have known was likely to occur.

The recognition of liability for emotional harm, in the circumstances we describe here, is in line with the rules that allow recovery for emotional injury outside the context of the tort of negligent infliction of emotional distress. We routinely allow recovery for pain and suffering as "parasitic" damages when the plaintiff's emotional distress is caused by the defendant's invasion of another legally-protected interest, such as freedom from physical injury. *See, e.g., Bond v. Ivanjack,* 740 A.2d 968, 974–76 (D.C.1999) (in medical malpractice case arising from doctor's failure to diagnose cancer, patient sought damages for "mental anguish and emotional distress based on her fear of recurrence of her cancer").[34] Damages for emotional distress also are awarded as part of compensation for violation of statutory and common law rights that result in foreseeable emotional distress. For example, damages for mental distress are awarded incident to: (1) the right to be free from discrimination, *see, e.g., Daka, Inc. v. McCrae,* 839 A.2d 682, 691 (D.C.2003) (considering an employee's common law claim for negligent supervision and statutory claim of retaliation and concluding that "the sexual harassment by an unsupervised [employee] and the retaliation by [the employer] that [the plaintiff] experienced are the stuff of which a claim for humiliation and emotional harm is composed, and . . . the jury could properly find that [the plaintiff] suffered actual and not speculative injury" (internal quotation marks omitted)); *United Mine Workers of Am., Int'l Union v. Moore,* 717 A.2d 332, 341 (D.C.1998) (noting that, in the context of the District of Columbia Human Rights Act, "[u]ndoubtedly, mental anguish or emotional distress may be considered in

---

34. *See also* RESTATEMENT (SECOND) OF TORTS, *supra,* § 47 cmt. b ("Where the actor's tortious conduct in fact results in the invasion of another legally protected interest, as where it inflicts bodily harm, or imposes a confinement, emotional distress caused either by the resulting invasion or by the conduct may be a matter to be taken into account in determining the damages recoverable. In many instances there may be recovery for emotional distress as an additional, or 'parasitic' element of damages in an action for such a tort.").

awarding compensatory damages"); (2) the common law right to be free from defamation, *see Vassiliades v. Garfinckel's, Brooks Bros.*, 492 A.2d 580, 594 (D.C.1985) ("A plaintiff whose private life is given publicity may recover damages for the harm to her reputation or interest in privacy resulting from the publicity and also for the 'emotional distress or personal humiliation . . . if it is of a kind that normally results from such an invasion and it is normal and reasonable in its extent.'" (quoting RESTATEMENT (SECOND) OF TORTS, *supra*, § 652H cmt. b)); and (3) the tort of breach of a confidential relationship, *id.*

We also allow a plaintiff to recover for loss of consortium that results from negligent conduct toward his or her spouse, even where the spouse was not physically injured and the plaintiff's injuries are purely emotional. *See Crowley v. N. Am. Telecomm. Ass'n*, 691 A.2d 1169, 1175 (D.C.1997) ("The resultant injury to the marriage by reason of the deprivation of society, affection and conjugal fellowship is no less because it did not result from physical harm to one spouse."); *Hitaffer v. Argonne Co.*, 87 U.S.App.D.C. 57, 60, 183 F.2d 811, 814 (1950), *overruled on other grounds by Smither & Co. v. Coles*, 100 U.S.App.D.C. 68, 242 F.2d 220 (1957) ("Consortium, although it embraces within its ambit of meaning the wife's material services, also includes love, affection, companionship, sexual relations, etc., all welded into a conceptualistic unity."). We have acknowledged that the negligent actor owes an "independent duty" to a spouse with a right to the marital consortium. *Hitaffer*, 87 U.S.App.D.C. at 66, 183 F.2d at 820; *see also Massengale v. Pitts*, 737 A.2d 1029, 1033 (D.C.1999) (holding that plaintiff's claim for loss of consortium can proceed even where the injured spouse was contributorily negligent).

Viewed against the broad spectrum of cases that permit recovery for emotional distress resulting from breach of an obligation owed to a particular person, we are hard pressed to justify a blanket prohibition on recovery where such breach has been proven simply because emotional distress is the only injury suffered. We conclude that the "zone of physical danger" rule should not preclude a plaintiff's recovery for negligently inflicted emotional distress where other factors in an existing relationship—that we now set out in this opinion—are more adequate to define, and also are adequate to limit, the defendant's responsibilities.[35]

## IV. The Duty to Avoid Inflicting Serious Emotional Distress

 We hold that a plaintiff may recover for negligent infliction of emotional distress if the plaintiff can show that (1) the defendant has a relationship with the plaintiff, or has undertaken an obligation to the plaintiff, of a nature that necessarily implicates the plaintiff's emotional well-being, (2) there is an especially likely risk that the defendant's negligence would

---

**35.** We also allow a plaintiff to recover damages for emotional distress that results from a defendant's "intentional" or "reckless" conduct that is "extreme and outrageous." *See, e.g., District of Columbia v. Tulin*, 994 A.2d 788, 800 (D.C.2010) (stating the elements for a claim of intentional infliction of emotional distress). In the intentional tort cases, the actor's conduct is directed to a specific person and "[t]he outrageousness of the defendant's conduct provides a guarantee that the mental disturbance is serious and not feigned." *Williams*, 572 A.2d at 1065 n. 10 (quoting PROSSER AND KEETON ON TORTS, *supra*, § 12, at 57). The elements of the tort, in other words, circumscribe the number of potential claimants and there is no risk of "limitless" liability. Therefore, the plaintiff alleging intentional infliction of emotional distress does not have to show that there was a threat of physical injury or actual physical injury. *See Howard*, 484 A.2d at 985.

cause serious emotional distress to the plaintiff, and (3) negligent actions or omissions of the defendant in breach of that obligation have, in fact, caused serious emotional distress to the plaintiff. Whether the defendant breached her obligations is to be determined by reference to the specific terms of the undertaking agreed upon by the parties or, otherwise, by an objective standard of reasonableness applicable to the underlying relationship or undertaking, *e.g.,* in medical malpractice cases, the national standard of care.[36] The likelihood that the plaintiff would suffer serious emotional distress is measured against an objective standard: what a "reasonable person" in the defendant's position would have foreseen under the circumstances in light of the nature of the relationship or undertaking. In addition, the plaintiff must establish that she actually suffered "serious and verifiable" emotional distress. *Jones,* 589 A.2d at 424. In the next sections we discuss two critical elements of the duty to avoid negligent infliction of emotional distress: the nature of the defendant's relationship or undertaking and the serious emotional distress that must be likely to be caused by the defendant's negligence.

▮ In the absence of such an undertaking or relationship between plaintiff and defendant, the general rule continues to be that there is no freestanding duty to avoid the negligent infliction of emotional distress to a "stranger"[37] unless the ac-

tor's negligent conduct has put the plaintiff in danger of bodily harm, *i.e.,* the *Williams* "zone of physical danger" rule that recognizes that "a near miss may be as frightening as a direct hit." 572 A.2d at 1067. We emphasize that the issue addressed in *Williams* and that we further refine today is one of duty *vel non,* an issue of law to be determined by the court as a necessary precondition to the viability of a cause of action for negligence. *See, e.g., Tolu,* 945 A.2d at 601 ("[T]he question of whether a defendant owes a duty to a plaintiff under a particular set of circumstances is entirely a question of law that must be determined only by the court." (quoting *Shannon,* 696 A.2d at 1365)); *see also* PROSSER AND KEETON ON TORTS, *supra,* § 37 at 236. It is for the court to consider the relevant evidence and make a decision on the pleadings, on summary judgment, or, where necessary, after a hearing. Once the court determines the existence of a duty to avoid inflicting emotional distress, the other elements of the cause of action—standard of care, breach, causation and damages—must be proven to the finder of fact by a preponderance of the evidence, *see Burke v. Scaggs,* 867 A.2d 213, 217 (D.C.2005); PROSSER AND KEETON ON TORTS, *supra* § 37, at 236–37, and the defendant may present defenses, such as the plaintiff's contributory negligence. But if the court determines there is no duty as a matter of law, the litigation comes to an end, and that decision is a final order of the trial court.

---

36. *See, e.g., Morrison,* 407 A.2d at 565 (adopting national standard of care for medical professionals and hospitals); *Meek v. Shepard,* 484 A.2d 579, 581 (D.C.1984) ("[T]he plaintiff must establish through expert testimony the course of action that a reasonably prudent doctor with the defendant's specialty would have taken under the same or similar circumstances."); *Kordas v. Sugarbaker,* 990 A.2d 496, 501 (D.C.2010) (noting that, where applicable, expert testimony should come from physician who is specialized in the relevant

practice area rather than from physician who merely holds the relevant general Board certification).

37. "Stranger" is used in the sense of "stranger liability"—the duty owed to a person with whom there is no independent relationship or obligation with legally cognizable consequences. *See Undertakings and Special Relationships, supra,* at 53–54.

## A. The Nature of the Defendant's Relationship or Undertaking

As discussed elsewhere in this opinion, we have determined that the zone of physical danger test is not necessary to limit the number of potential claimants in all cases because the supplemental rule we announce today contains a self-limiting principle based on the nature of the defendant's relationship with, or undertaking to, the plaintiff. See *supra*, pp. 802–03 and *infra*, pp. 819–20. We do not here intend to catalog all the undertakings or relationships that give rise to a duty to avoid causing emotional distress.[38] To propose such a listing at this time could pre-empt claims that are not before us, a limitation in the scope of judicial pronouncements that we have expressly rejected. See *Carl v. Children's Hosp.*, 702 A.2d 159, 160 (D.C.1997) (per curiam) (en banc) (noting that prior recognition of "a very narrow exception" to the employment at-will doctrine "should not be read in a manner that makes it impossible to recognize any additional public policy exceptions ... that may warrant recognition"). The development of common law proceeds on a case-by-case incremental basis, and it is on that solid factual ground that judicial opinions build on a framework for analysis based on certain general precepts. As we did in *Carl*, we endeavor to set out standards so that future claims can be properly assessed by the bench and bar. See *id.* at 162 (noting that to come within a "public policy exception" to the at-will employment doctrine, exception must be "firmly anchored either in the Constitution or in a statute or regulation which clearly reflects the 'public policy' being relied upon").

■ We agree with Professor Dobbs that in order to satisfy the exception to the general rule we set forth here, a relationship[39] or undertaking must "implicate" the plaintiff's emotional well-being. See *Undertakings and Special Relationships,*

---

**38.** We do not read the reference in the draft Third Restatement § 46(b) to "specified categories of activities, undertakings or relationships" as implying that a court should identify and delineate them all at once, as a legislature might do in drafting a statute; rather, as the Restatement is a distillation of the common law that has developed, and is continuing to develop, in this area, § 46(b) refers to such "activities, undertakings or relationships" as courts, over time, come to recognize as coming within the rule. "Although Restatements are expected to aspire toward the precision of statutory language, they are also intended to reflect the flexibility and capacity for development and growth of the common law. They are, therefore, phrased not in the mandatory terms of a statute but in the descriptive terms of a judge announcing the law to be applied in a given case." THE AMERICAN LAW INSTITUTE, CAPTURING THE VOICE OF THE AMERICAN LAW INSTITUTE (2005).

**39.** As we explain in the text, not all relationships will give rise to a duty to avoid negligent infliction of emotional distress, as the law recognizes and imposes a duty of care on many different types of relationships, not all of which necessarily implicate the emotional well-being of the parties. See *Undertakings and Special Relationships, supra,* at 49 & n. 1. (referring to relationships involving "(1) carrier-passenger, (2) innkeeper-guest, (3) invitor-invitee or possessor of land open to the public and one lawfully upon the premises; (4) employer-employee, (5) school-student, (6) landlord-tenant, and (7) custodian-ward"); *Vassiliades*, 492 A.2d at 591–92 (noting that fiduciaries have a duty to "scrupulously honor the trust and confidence reposed in them because" of fiduciary relationship); *District of Columbia v. Royal*, 465 A.2d 367, 369 (D.C. 1983) (recognizing the District's duty of care for the protection of school children in its schools); *Smith v. Safeway Stores, Inc.*, 298 A.2d 214, 216 (D.C.1972) (recognizing duty of care owed by business invitor to invitee); *Graham*, 424 A.2d at 105 (recognizing duty of reasonable care owed by landlord to tenants with respect to a building's common areas); *Kline v. 1500 Massachusetts Ave. Apartment Corp.*, 141 U.S.App.D.C. 370, 439 F.2d 477 (1970) (recognizing duty of innkeeper to guest).

*supra*, at 49, 68. There are some relationships, such as that of psychiatrist/therapist and patient, where care for the emotional well-being of the patient is the very subject and purpose of the engagement, and it can be said that the psychiatrist or therapist has undertaken to care for the patient's emotional well-being, making it especially likely that the therapist's negligence will cause the patient to suffer emotional distress. *See id.* at 54; *Corgan*, 158 Ill.Dec. 489, 574 N.E.2d at 607 (recognizing that the "nature of the therapist-patient relationship gives rise to a duty ... to refrain from ... causing emotional or mental harm to the patient"). Certain other doctor-patient relationships can be said to involve the care of not just physical illness or conditions, but also of the mental and emotional distress that can result from physical ailments and, indeed, can trigger, aggravate and impede the treatment and alleviation of illness and symptoms. Because care for the body and the emotions are so interlinked, and patients often are dependent on their physicians' exercise of due care, they therefore are susceptible to suffer emotionally as well as physically as a result of their physicians' negligence. For these reasons, most cases claiming negligent infliction of emotional distress have arisen—and we think will continue to arise—in the context of doctor-patient relationships. In most of those cases, there will have been some physical injury as well, and damages for emotional distress ("pain and suffering") may be awarded if the patient's distress was proximately caused by the doctor's negligence.

In the relatively small subset of cases where the patient suffers only emotional distress, these claims will on the surface be indistinguishable from the usual medical malpractice actions. But there is a further—and critical—limiting principle: it must be "especially likely," RESTATEMENT (THIRD) OF TORTS, *supra*, § 46(b), that there would be serious emotional distress, *i.e.*, a "deeply emotional response," *Oswald*, 453 N.W.2d at 639, in the event that the underlying obligation is breached.[40] If an emotional response of such magnitude is anticipated, a doctor would be expected, as a matter of reasonable care, to take precautions to avoid causing serious emotional distress, just as a doctor would take care to use sterile instruments in order to prevent a serious infection during the course of an operation. *See Curtis*, 956 P.2d at 963 (holding that plaintiff had successfully stated a claim for emotional distress where complaint alleged that "defendants were medical professionals who owed a duty to plaintiff to identify and guard against predictable psychological reactions or consequences—including claustrophobic reactions—to [an] MRI procedure"); *Larsen*, 81 P.3d at 203 (permitting claim for emotional distress by mother and daughter estranged for over forty years as a result of hospital's negligent switching of babies in nursery).

We emphasize that because it must be especially likely that *serious* emotional distress will result from negligent performance, not all cases of medical negligence, even if otherwise actionable, will give rise to liability for infliction of emotional dis-

---

**40.** As acknowledged by the draft Third Restatement: "Whatever courts say about foreseeability in these cases, foreseeability cannot appropriately be employed as the standard to limit liability for emotional harm." RESTATEMENT (THIRD) OF TORTS, *supra*, § 46 cmt. f. "For example, a doctor who negligently (and incorrectly) diagnoses a popular movie star or professional athlete as having terminal cancer is not liable to the star's fans who suffer emotional disturbance upon hearing the diagnosis, even though such harm is clearly foreseeable." *Id.*

tress. Judges will necessarily have to draw on their reservoir of knowledge of societal norms, as well as evidence of professional and ethical standards and norms of practice. *See, e.g., Curtis,* 956 P.2d at 963 (noting that standard of care required that precautions be taken to "avoid or minimize" psychological reaction to confinement during an MRI examination). There are evident differences between the duty of a hospital or obstetrician whose negligence results in death or permanent injury to a child during labor and delivery and thereby causes deep distress in the mother, *Burgess,* 9 Cal.Rptr.2d 615, 831 P.2d at 1199, 1203 (recognizing the "unique relationship between mother and child during pregnancy and birth" and permitting mother's claim for emotional distress where "the mother's emotional well-being and the birth of the child are inextricably intertwined"); the duty of a doctor who negligently arrives at a late diagnosis of cancer and leaves the patient with dread and uncertainty about the consequences of delayed treatment, *see Bond,* 740 A.2d at 974–76; and the duty of a podiatrist who is engaged to treat a patient for an ingrown nail, a responsibility that, we submit, is evidently not concerned with the emotional well-being of the patient.

Although most cases for negligent infliction of emotional distress have arisen in the context of doctor-patient relationships, courts have recognized the claim in other situations where the emotional well-being of others is at the core of, or is necessarily implicated by, the undertaking. For example, where the negligent performance of an undertaking causes emotional pain associated with the death of a loved one as a result of a hospital's false report of death or a funeral home's mishandling of a corpse, a claim for negligent infliction of emotional distress is allowed because such damages are not only especially likely to be caused by the breach but also because

they may well be the only or most significant damages resulting from the negligent conduct. *See* Prosser and Keeton on Torts, *supra,* § 53, at 362 (reviewing cases involving claims for negligent transmission of a death message and mishandling of corpses), *discussed in Washington,* 646 A.2d at 352 (Schwelb, J., dissenting). In those cases it cannot be said—as it can in the context of the therapist and patient—that the funeral home or hospital expressly undertook to care for the emotional well-being of the deceased's widow, parent or child. Rather, that undertaking is implied, and fairly so, based on the understanding of who is intended to benefit from the obligation: not the deceased, but the deceased's close survivors as they cope with their loss. As a result, it is especially likely that failure to adhere to reasonable care in fulfilling obligations related to the deceased with competence and dignity, *e.g.,* a mortuary's obligation to embalm and transport the body properly or the hospital's obligation to accurately notify a relative that a loved one has died while in the hospital's care, will result in serious emotional distress. In these cases, the consequence of serious emotional distress follows ineluctably from the breach.

A similar argument could be made with respect to persons who are appointed to act as guardians and counsel for those who are especially vulnerable: children, the elderly, and the disabled. *See* Restatement (Third) of Torts, *supra,* § 46 cmt. d (referring to relationships "where one person is in a position of power or authority over the other and therefore has greater potential to inflict emotional harm"). In determining whether such appointments comprise a duty to care for the emotional well-being of wards and clients, a court should weigh several factors, including the statutory, professional and ethical standards applicable to the defendant's activities establish-

ing the responsibilities the defendant can be said to have accepted and to which she should be held accountable;[41] the nature of the interests of the ward or client that the guardian or counsel is obligated to further and protect (whether financial, legal or business matters unlikely to implicate a ward's emotional well-being, or questions involving health, independence and conditions affecting personal dignity that might implicate a ward's emotional well-being), and relevant policy considerations, such as the need to have a pool of qualified persons willing to be appointed to such positions and the availability of insurance or other options for risk-management of potential claims for emotional distress.

As cases from other courts suggest, moreover, many other relationships, even if they involve fiduciary obligations, generally will not come within the rule, because neither the purpose of the relationship nor the fiduciary's undertaking is to care for the plaintiff's emotional well-being; rather the object of the engagement is to obtain a financial, commercial or legal objective, even if its non-attainment due to the fiduciary's negligence is emotionally distressing to the client. *See Reed v. Mitchell & Timbanard, P.C.,* 183 Ariz. 313, 903 P.2d 621, 626 (App.1995) (refusing to impose duty to avoid negligent infliction of emotional distress on lawyer who undertook to represent client in a financial matter); *Lawrence v. Grinde,* 534 N.W.2d 414 (Iowa 1995) (same, bankruptcy attorney); *Rathgeber v. James Hemenway, Inc.,* 335 Or. 404, 69 P.3d 710, 718 (2003) (noting that "real estate professional malpractice" is not within the exception even though "[i]t is always foreseeable that some emotional harm might result from the negligent per-

formance of real estate professional services, as it might from legal, accounting, or other varieties of professional malpractice"). In these cases, it cannot be said that the plaintiff's emotional well-being is necessarily implicated by the defendant's undertaking or relationship with the plaintiff. Similarly, emotional distress resulting from negligently caused injury to personal property, including pets and other animals, has not been recognized to state a viable claim. *See* RESTATEMENT (THIRD) OF TORTS, *supra,* § 46 cmt. j.

We caution again that this is not intended to be an exclusive catalog of relationships or undertakings that may sustain viable claims for negligent infliction of emotional distress, nor is it meant to categorically exclude certain types of relationships or undertakings—the determinative factor will always be whether the facts of the particular case show that the essential elements of the duty are presented: (1) a relationship or undertaking to the plaintiff that necessarily implicates the plaintiff's emotional well-being, and (2) the special likelihood that the defendant's negligence in the course of performing obligations pursuant to such relationship or undertaking will result in emotional distress, *see supra* pp. 811–12, that, as we now discuss, must be "serious" emotional distress.

## B. Serious Emotional Distress

Because the duty to avoid inflicting emotional distress is tethered to the obligation of the defendant pursuant to an undertaking or relationship, and compliance with the obligation in tort is usually measured

---

41. *See, e.g.,* with respect to guardians, D.C.Code § 21–2047(a)(1); SUPERIOR COURT OF DISTRICT OF COLUMBIA, PROBATE ATTORNEY PRACTICE STANDARD 6—GUARDIAN; and D.C. R. Prof. Con-

duct 1.14 (Client with diminished capacity); *see generally In re Orshansky,* 804 A.2d 1077, 1096 (D.C.2002).

against an objective standard,[42] it is also appropriate to measure the likelihood of emotional harm against a "reasonable person" standard in most cases.[43] This is consistent with the draft Third Restatement, which states that the requirement for "serious" emotional disturbance has both a subjective and an objective component:

[T]he stimulus must be one that would cause reasonable persons to suffer serious emotional disturbance. Thus, there is a subjective and objective component to this requirement. An unusually susceptible person may not recover if an ordinary person would not have suffered serious emotional disturbance. A person may nevertheless recover for all harm caused, even if more serious because of the predisposition or special vulnerability of the person, if the stimulus is sufficient to cause a reasonable person to suffer serious emotional disturbance.

RESTATEMENT (THIRD) OF TORTS, *supra*, § 46 cmt. i; *see Drejza*, 650 A.2d at 1314 n. 16 (citing RESTATEMENT (SECOND) OF TORTS, *supra*, § 46 cmts. f & j); *see also Chizmar*, 896 P.2d at 204 ("[S]erious mental distress may be found where a reasonable man, normally constituted, would be unable to adequately cope with the mental stress engendered by the circumstances of the case." (quoting *Rodrigues v. State*, 52 Haw. 156, 472 P.2d 509, 520 (1970))); *accord Paugh v. Hanks*, 6 Ohio St.3d 72, 451 N.E.2d 759, 765 (1983); *cf. Williamson v. Bennett*, 251 N.C. 498, 112 S.E.2d 48 (1960) (holding that plaintiff's outsized emotional reaction to car accident was not allowed as basis for emotional distress damages where reasonable person would have experienced some anger or been upset, but would not have suffered severe distress). That likelihood may be shown by evidence that professionals in the field recognize the risk of serious emotional distress, *see, e.g., Curtis*, 956 P.2d at 963 (referring to patient's "predictable psychological reactions or consequences" after being placed in enclosed MRI machine); J.T. Ptacek & Tara C. Eberhardt, *Breaking Bad News: A Review of the Literature*, J. AM. MED. ASS'N 496, 496 (1996) (discussing best medical practice in "situations where there is either a feeling of no hope, [or] a threat to a person's mental or physical well-being"), but we do not foreclose the possibility that in some cases the likelihood of serious emotional distress is so great that it could be evident to the judge from generally accepted societal expectations due to the nature of the relationship or undertaking and the egregiousness of the breach of obligation.

In addition, serious emotional distress will be deemed "especially likely" where the defendant has an undertaking or relationship with the plaintiff that implicates care for emotional well-being and knows or should know that the plaintiff is unusually susceptible to suffer emotional distress. We have held that in a suit for intentional infliction of emotional distress, "acts which are not generally considered outrageous may become so when the actor knows that the other person is peculiarly susceptible to emotional distress." *Drejza*, 650 A.2d at 1313 & n. 12 (quoting *District of Columbia v. Thompson*, 570 A.2d 277,

---

42. Where the undertaking is contractual, the terms of the parties' contract may define the scope of the obligation and, possibly, the resulting liability for breach. See *supra* n. 18.

43. For example, it is especially likely that a therapist's disclosure of highly personal information revealed by a patient who feels vulnerably exposed during therapy sessions would cause serious emotional distress. *See Vassiliades*, 492 A.2d at 592 ("[T]he breach of a physician-patient [confidential] relationship is an actionable tort.").

291 (1990)). If the defendant's knowledge of the plaintiff's special vulnerability can transform an otherwise commonplace conduct into an "outrageous" act sufficient to trigger liability under the strict standards for intentional infliction of emotional distress, *a fortiori* in a negligence action, normal prudence requires that the duty to care for the plaintiff's well-being must be calibrated to the plaintiff's known fragility.

■ Finally, the emotional distress that is especially likely, and eventually proved to have occurred, must be "serious and verifiable," *Jones,* 589 A.2d at 424, irrespective of whether a claim is analyzed under *Williams* or the rule we describe here. We have not had occasion to date to opine on what type of emotional distress will be considered serious enough to be compensable and we do not offer a definition in the abstract. What we can say is that to give rise to a duty in the context of an action for negligent infliction of emotional distress, the emotional distress must be acute, enduring or life-altering.

### V. Policy Considerations

■ Finally, because recognizing a duty is ultimately a determination grounded upon policy considerations, *see Cooper,* 483 A.2d at 321, we address several policy-based arguments made by appellees and amicus CNMC. They posit a number of situations as examples of the ways in which a rule based upon relationships and undertakings might "adversely affect the delivery of health care in the District of Columbia" by, *inter alia,* discouraging doctors from adopting "early and aggressive" treatment of HIV/AIDS and other serious illnesses or preventing doctors from following the established "differential diagnosis" strategy that seeks to eliminate the most serious possible health concerns first. We are unpersuaded by these hypothetical scenarios, however, because none

is premised upon a breach of the applicable standard of care by the medical care provider—an indispensable element of a negligence claim. To the contrary, they exemplify doctors providing prudent treatment. It is beyond cavil, however, that a plaintiff's claim for negligent infliction of emotional distress cannot succeed if the doctor's treatment conformed to the applicable standard of care, even if emotional distress will inevitably result during the patient's treatment. The rule we adopt for recognizing the existence of a duty does not abrogate the well-settled rules of negligence, which require a showing of an obligation to act (or refrain from acting) in a specific manner, breach of that obligation, and proximate causation. In cases involving doctors, therefore, a plaintiff must present expert testimony that the doctor breached the national standard of care and must prove that this breach was reasonably likely to cause an objective person, and in fact did cause the plaintiff, to suffer serious emotional distress. The plaintiff's burden of proof, rather than the court's legal determination of a duty, provides the appropriate means of protecting medical care providers from the type of frivolous claims that concern appellees and amicus CNMC.

■ We also are convinced that to refuse to recognize a duty in all cases simply because there is no risk of physical injury, even where, as here, the defendant is alleged to have breached an established obligation that predictably caused serious emotional distress to the plaintiff, would unfairly allow the negligent actor to be immunized from liability at the expense of the injured person. *See Washington,* 646 A.2d at 353 (Schwelb, J., dissenting) ("Where the injury to [the plaintiff's] feelings is as real and as palpable as that claimed here, we ought not to deny ... redress."). The result that appellees advo-

cate is not without societal costs and leaves unfulfilled the purpose of negligence law to provide redress for breach of legally recognized obligations. The rule we adopt, in contrast, holds negligent actors to account in situations where the nature of their undertaking or relationship entailed the special likelihood that serious emotional harm to a specific person would result from breach of their legal obligations and compensates a claimant who can prove that serious injury was, in fact, caused by the breach, in conformance with traditional principles of negligence law.

Appellees are also concerned that a rule that establishes a duty based upon the relationship between the parties—rather than focusing on whether the plaintiff was placed within the "zone of physical danger"—does not "acknowledge[ ] the difficulty, in cases presenting solely claims of mental or emotional distress, of parceling cause and effect . : . and how difficult it is for juries to resolve such cases based upon anything other than speculation." But we have already crossed that bridge. This concern is universally applicable to emotional distress claims, including those routinely awarded as "parasitic" damages in the context of the common law or statutory actions discussed above. As we said in *Williams,* "the question of proof in individual situations should not be the arbitrary basis upon which to bar all actions." *Williams,* 572 A.2d at 1067 (quoting *Battalla v. State,* 10 N.Y.2d 237, 219 N.Y.S.2d 34, 176 N.E.2d 729, 731 (1961)). Nor are we persuaded by the usual "flood gates" argument. Once a duty to avoid inflicting emotional distress is established, "fear of opening the gates to a flood of litigation [should not] be determinative of whether the interest in question should be legally protected." *Williams,* 572 A.2d at 1067. We see no need to revisit these issues here.

Finally, appellees and CNMC cite *Consolidated Rail Corp. v. Gottshall,* 512 U.S. 532, 114 S.Ct. 2396, 129 L.Ed.2d 427 (1994), as support for their argument that the "zone of physical danger" test remains the best means of determining the scope of the actor's duty in negligent infliction of emotional distress cases. We do not find this argument persuasive. In *Consolidated Rail,* the Supreme Court was tasked with identifying the proper standard for evaluating claims for negligent infliction of emotional distress that are brought under the Federal Employers' Liability Act ("FELA"). The Court chose the "zone of danger" test from three possibilities: (1) the physical impact test; (2) the zone of danger test; and (3) the "relative bystander" test as articulated by the California Supreme Court in *Dillon v. Legg,* 69 Cal. Rptr. 72, 441 P.2d at 920. *See Consol. Rail Corp.,* 512 U.S. at 546–49, 114 S.Ct. 2396. The *Consolidated Rail* opinion gives no indication that a rule based on an underlying relationship or undertaking such as the one we adopt here was considered by the Court. Furthermore, the Court gave great weight to the fact that the zone of danger test "had been adopted by a significant number of jurisdictions" at the time of FELA's enactment in 1908, and was still in use by fourteen jurisdictions when it decided the case in 1994. *Id.* at 554–55, 114 S.Ct. 2396. Of course, appellant's claim before us is not governed by FELA or any other statute, but by the common law we apply and develop as appropriate, on a case-by-case basis. Here we are presented with a claim of serious emotional distress, negligently inflicted, in the context of an established doctor-patient relationship with consequences that fail to satisfy the "zone of physical danger" test. We think that the rule based on undertakings or special relationships that expressly or necessarily implicate the plaintiff's emotional well-being and where

negligent performance of an objectively ascertainable obligation is especially likely to result in serious emotional distress, squarely addresses the concern, expressed not only in *Williams* but throughout the *Consolidated Rail* opinion, *see id.* at 545–46, 551–52, 114 S.Ct. 2396, that compensable emotional injuries could be infinite if courts did not impose limitations on duty beyond the concept of mere foreseeability. The duty we define in this opinion draws a finite and circumscribed area of liability, to identifiable claimants.

## VI. Remand

■ Having set out the legal requirements, we now turn to the facts alleged by appellant. On December 13, 2000, appellant, Terry Hedgepeth, visited the Whitman Walker Clinic ("WWC") and requested an HIV test. *Hedgepeth,* 980 A.2d at 1230. Appellant told an intake worker at WWC that he "thought [he] had HIV" because he "found out that [his] girlfriend was HIV-positive." The intake worker then noted that appellant was "HIV-positive" on appellant's file. WWC took a blood sample from appellant, which was sent to American Medical Laboratories, Inc. ("AML") for testing. AML administered an HIV–1/HIV–2 Antibodies ELISA test, which was "non-reactive" and therefore indicated that appellant was not HIV-positive. *Id.* However, due to human error, a "Client Lab Results" form prepared at the clinic mistakenly showed that appellant tested positive for HIV. Dr. Mary Fanning, M.D., who worked at WWC, had appellant's file, which contained both the inaccurate "Client Lab Results" form and the accurate results of the HIV–1/HIV–2 Antibodies ELISA test. When she met with appellant, Dr. Fanning told him, incorrectly, that he had tested positive for HIV. Dr. Fanning also told appellant that he was asymptomatic for HIV and had a "normal" viral load. *Id.*

Following the mistaken diagnosis delivered in 2000, appellant believed that he was HIV positive for five years.[44] He became depressed and began having suicidal thoughts, which resulted in his admission to the psychiatric wards at George Washington University Hospital in January 2001, and at Sibley Hospital in 2002. *Id.* at 1231. He was prescribed several medications for depression.[45] He lost his job as a restaurant manager. Appellant's relationship with his daughter also suffered as a result of his depression. Appellant used illegal drugs, suffered from an eating disorder, and began to have sexual intercourse with a woman he knew to be HIV-positive "[b]ecause [he] was diagnosed with HIV and there was no reason for [him] to live." *Id.*

Appellant visited the Abundant Life Clinic in June 2005, where he was again tested for HIV. The test revealed that appellant was not HIV positive. *Id.* According to Dr. Abdul Muhammad, the treating physician at Abundant Life, upon hearing the negative test result, appellant wept and appeared to him as though he were "a man being released from prison." Appellant confirmed his negative test result several weeks later at the Johns Hopkins Bayview Medical Center.

---

**44.** Throughout this time, appellant did not take any medications related to his "HIV-positive" status. WWC, however, filed medical forms that made appellant's treatment at WWC eligible for funding under the Ryan White program. WWC personnel also approved a form to apply for public assistance through the AIDS Drug Assistance program, which erroneously stated that appellant had been prescribed Combivir and Crixivan.

**45.** Appellant's prescription medications for depression included Zoloft, Ambien, Trazodone, and Wellbutrin.

Summary judgment can be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Super. Ct. Civ. R. 56(c). Our standard of review on both issues is *de novo*. *See, e.g., Kuder v. United Nat'l Bank,* 497 A.2d 1105, 1106–07 (D.C.1985).

Appellees do not dispute that they owed a duty of care to appellant as their patient; appellant alleges that this duty was breached when appellees negligently misinformed him that he was HIV positive, and has presented testimonial and documentary evidence in support of his allegations. Furthermore, there is evidence in the record to support that the nature of appellees' duty to appellant necessarily implicated his emotional well-being and that it was especially likely that a doctor's breach of duty in misdiagnosing a patient with HIV-infection would result in serious emotional harm. Appellant's actions and suffering after the misdiagnosis reveal that when a patient is told that he has a life-altering or life-threatening chronic disease, this information can and does cause serious emotional distress. When the diagnosis is for HIV—a potentially fatal infection that carries a significant social stigma—the emotional impact can be catastrophic. WWC does not dispute that patients who are informed that they are HIV positive often suffer serious emotional distress. Indeed, WWC implicitly recognizes this risk; its brief recounts that WWC provides counseling to patients who test positive for HIV "to help the person understand how to live with the virus, and also to accept that, in 2010, the presence of HIV is not tantamount to a 'death sentence.'" In one commentator's view, appellant's distress is "inseparable" from breach of the appellees' "core undertakings." *Undertakings and Special Relationships, supra,* at 62. Nor does WWC dispute that appellant actually suffered serious emotional distress, a claim that appellant has sought to verify with evidence of his admission to two psychiatric wards, prescriptions for several anti-depressants, the deterioration of his relationships with his employer and with his daughter, and his risk-taking behavior. In sum, there is both objective and subjective evidence that serious emotional distress would result from appellees' negligent misdiagnosis of HIV.

Applying the rule we enunciate in this opinion, we conclude that on this record appellees are not entitled to summary judgment on appellant's claim of negligent infliction of emotional distress. Accordingly, we reverse and remand the case for further proceedings in the trial court consistent with this opinion.

*So ordered.*